# In the United States Court of Federal Claims

No. 12-597C

(Filed Under Seal: February 7, 2013)
(Reissued: February 14, 2013)

| | |
|---|---|
| **MILES CONSTRUCTION, LLC,** | ) |
| | ) Pre-award bid protest; disparate intra- |
| | ) agency decisions regarding the |
| **Plaintiff,** | ) unconditional nature of a service-disabled |
| | ) veteran's ownership of a small business; |
| **v.** | ) evidence of "ownership" within the |
| | ) meaning of 38 C.F.R. § 74.3; prejudice; |
| **UNITED STATES,** | ) remedy |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

Edward T. Delisle, Cohen, Seglias, Pallas, Greenhall & Furman, P.C., Philadelphia, PA, for plaintiff. With him on the briefs was Maria L. Panichelli, Cohen, Seglias, Pallas, Greenhall & Furman, P.C., Philadelphia, PA.

Jeremiah M. Luongo, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

This pre-award bid protest is before the court on plaintiff's motion for judgment upon the administrative record and the government's motion to dismiss, or in the alternative, cross-motion for judgment. On March 5, 2012, plaintiff, Miles Construction, LLC ("Miles"), had obtained a determination from the Department of Veterans Affairs' ("VA's") Center for Veterans Enterprise ("CVE") that it was a qualified service-disabled veteran-owned small business ("SDVOSB") concern eligible to participate in VA's Veterans First Contracting Program, which accords

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before February 13, 2013. The resulting redactions are shown by asterisks enclosed by brackets, as "[***]."

priority to SDVOSBs and veteran-owned small businesses ("VOSBs") for contracting opportunities. Nonetheless, after Miles was the apparent lowest responsive and responsible bidder for a solicitation set aside for SDVOSBs, an agency protest by the second-lowest bidder resulted in a decision by VA's Office of Small and Disadvantaged Business Utilization ("OSDBU") that Miles "d[id] not meet the status requirements of a SDVOSB concern" and was therefore ineligible for awards under the Veterans First Contracting Program. AR 19-267 (Letter from Thomas Leney to Morgan Slizofski (Aug. 27, 2012)).[2] Miles challenges that decision and seeks to be reinstated into the Program and potentially to be awarded the contract from which the protest stemmed.

## FACTS[3]

Miles is a limited liability corporation organized under the laws of the Commonwealth of Pennsylvania. Compl. ¶ 8. Mr. Morgan Slizofski, a service-disabled veteran, owns 51 percent of the company, with [***] owning the remaining 49 percent. Compl. ¶¶ 11-12. On January 19, 2011, Miles first applied for inclusion in the VA VetBiz Vendor Information Pages ("VIP") Verification Program as a SDVOSB. *See* Pl.'s Mem. . . . in Support of Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Mem.") at 4. CVE conducted a thorough investigation of Miles, performing an on-site examination of the company's premises and a review of documents. AR 74-778 to -93 (Report of Harry Armstrong, CVE Examiner (Mar. 21, 2011)). After discussions between representatives for CVE and Miles, Miles altered its operating agreement ("Agreement") by rescinding a supermajority requirement for certain actions and making other changes. Pl.'s Mem. at 4; *see also* AR 74-778 to 75-794. Notwithstanding these changes, Miles' application was denied on the ground that Mr. Slizofski still did not fully control the company in accord with 38 C.F.R. § 74.4, which sets out the control requirements for a SDVOSB or VOSB. *See* AR 77-796 to 800 (Letter from Gail Werner, Deputy Director of CVE, to Slizofski (Apr. 6, 2011)). After six months, the requisite waiting period identified in VA's regulations during which a rejected applicant may not file a new application, Miles again sought verified status as a SDVOSB. In the intervening time, Miles revised its corporate documents to adhere to guidance provided by CVE regarding "control." Miles resubmitted its application on November 17, 2011. AR 86-835. On March 5, 2012, CVE approved Miles as a SDVOSB and added it to the database

---

[2]"AR ____" refers to the administrative record filed with the court in accord with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the page number of the administrative record, *e.g.*, "AR 6-28" refers to page 28, which is found in tab 6. The pages of the administrative record are paginated sequentially without regard to the tabs.

[3]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions regarding standing, prejudice, and equitable factors. See *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

2

of companies eligible for Veterans First Contracting Program projects. AR 93-1003 (SDVOSB Approval (Mar. 5, 2012)).[4]

On May 21, 2012, VA opened bids for Solicitation Number VA-244-12-B-0455 ("Solicitation"), which involved a contract for the repair of a storm sewer at the Coatesville, Pennsylvania VA Medical Center that was set aside for SDVOSB entities. AR 8-30. Miles submitted a bid in response to the Solicitation and was the apparent lowest bidder. *See* AR 12-246 to -47 (Abstract of Offers). On June 25, 2012, the second-lowest bidder, Veteran Construction & Utility Services, Inc. ("Veteran"), challenged Miles' eligibility as a SDVOSB and lodged a protest with the Solicitation's contracting officer. AR 14-249 to -56 (Veteran Protest (June 25, 2012)).[5] In the protest letter, Veteran alleged a "[c]ontrol and ownership violation" because it believed Miles and a non-SDVOSB, [***] , had common ownership and control, thus rendering Miles ineligible for SDVOSB status. AR 14-250. Veteran alleged that [***] was using the service-disabled veteran status of Miles' owner, Mr. Slizofski, as a "pass thru" from Miles to [***]. *Id.*

After a delay of more than six weeks, VA's contracting officer forwarded the protest to OSDBU's Executive Director. AR 18-262 to -63 (Notice to OSDBU of Veteran Protest (Aug. 9, 2012)). OSDBU notified Miles of the protest on August 15, 2012, asking Miles to "respond directly to the allegations made in the status protest." AR 104-1028 (E-mail from Amy Endicott to Slizofski (Aug. 15, 2012)). In a subsequent e-mail sent the same day, OSDBU noted that it would "review the protest against [Miles] as well as complete another review of . . . company documentation to ensure [Miles] meet[s] the requirements of 38 C.F.R. Part 74 as a valid SDVOSB." AR 104-1027 (E-mail from Endicott to Slizofski (Aug. 15, 2012)). OSDBU gave Miles only one week to respond, "due to the time-sensitive nature of the Status Protest program." *Id.* Miles timely responded to the allegations of the protest and included supporting documentation. *See* AR 105-1029 to -35 (Miles' Response to Veteran Protest (Aug. 15, 2012)). On August 27, 2012, OSDBU stated that it had investigated Veteran's claims and did not see evidence that Miles served as a pass through for [***] or that Mr. Slizofski did not possess the requisite control over the company. *See* AR 19-264 to -68 (Letter from Thomas J. Leney to Slizofski (Aug. 27, 2012)). OSDBU nonetheless advised Miles that it had concluded that Mr. Slizofski did not possess unconditional ownership of the company as required by 38 C.F.R. § 74.3(b) because Articles X, XI, and XII of the company's Operating Agreement allegedly contained restrictions on the transfer of his ownership interest. *Id.* OSDBU advised that the absence of unconditional ownership rendered Miles ineligible for SDVOSB status under 38

---

[4]Miles' eligibility certification was valid for one year from the date of verification. AR 93-1003 (SDVOSB Approval (Mar. 5, 2012)).

[5]The Veterans Affairs Acquisition Regulation System ("VAAR"), codified at 48 C.F.R. Parts 801-873, permits offerors to challenge another offeror's SDVOSB status through an agency-level protest considered by OSDBU. *See* 48 C.F.R. § 819.307.

C.F.R. Part 74, and thus Miles was ineligible for an award under the Solicitation and would be removed from the VIP database. AR 19-267.[6]

On September 13, 2012, Miles filed a pre-award bid protest action in this court, alleging that OSDBU's decision was arbitrary and capricious and contrary to law, and seeking reinstatement as a SDVOSB as well as the contractual award. Although Miles sought a preliminary injunction, the government represented that the contract would not yet be awarded, and the court accordingly deferred ruling on Miles' motion for a preliminary injunction and consolidated the proceedings on a preliminary injunction with those on the merits in accord with RCFC 65(a)(2). *See* Order Deferring Ruling on Mot. for Prelim. Inj. (Sept. 19, 2012), ECF No. 11. On October 24, 2012, Miles filed a motion for judgment on the administrative record, and on November 9, 2012, the government filed a motion to dismiss, or in the alternative, a cross-motion for judgment on the administrative record ("Def.'s Mot."). Briefing of the cross-motions was completed, and a hearing was held on December 4, 2012.[7]

## JURISDICTION

Under the Tucker Act as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), this court has jurisdiction over (1) pre-award bid protests, (2) post-award bid protests, and (3) an alleged violation of a statute or regulation in connection with a procurement:

> [T]he United States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement*. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (emphasis added); *see also Rothe Dev., Inc. v. United States Dep't of Def.*, 666 F.3d 336, 338 (5th Cir. 2011) ("[T]he Court of Federal Claims now retains exclusive jurisdiction over 'action[s] by an interested party' 'objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'" (quoting 28 U.S.C. § 1491(b)(1))).

---

[6]Miles' VetBiz profile was removed from the VIP database "[a]lmost immediately following . . . OSDBU's ruling." Pl.'s Mem. at 9.

[7]On January 31, 2013, the court issued a temporary restraining order barring VA from awarding a contract for the storm sewer repair at the Coatesville, Pennsylvania VA Medical Center for fourteen days or until issuance of the court's decision on the merits, whichever was sooner.

Miles alleges that VA contravened its regulations governing VOSB eligibility through an improper and inconsistent application of 48 C.F.R. § 819.307 (pertaining to "SDVOSB/VOSB Small Business Status Protests") and 38 C.F.R. Part 74 (setting out VA's "Veterans Small Business Regulations"). Sections 74.3 and 74.4 of 38 C.F.R. Part 74 specify the standards for CVE's evaluation of applicants for VOSB status and the eligibility for inclusion in the Veterans First Contracting Program, and those standards are explicitly incorporated by reference in the VAAR provisions governing SDVOSB and VOSB small business status protests. *See* 48 C.F.R. § 819.307(c). Miles' allegations thus properly invoke this court's bid protest jurisdiction under the third prong of Paragraph 1491(b)(1). *See Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) ("On its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement."); *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("§ 1491(b) . . . does not require an objection to the actual contract procurement . . . . As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."); *Angelica Textile Servs. v. United States*, 95 Fed. Cl. 208, 215 (2010) ("The phrase 'in connection with' is very sweeping in scope." "[A] procurement 'includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with the contract completion and closeout.'" (quoting *RAMCOR*, 185 F.3d at 1289 (first quote); 41 U.S.C. § 403(2) (second quote))). Accordingly, this court finds that it has jurisdiction to consider this dispute under 28 U.S.C. § 1491(b)(1).

The government nonetheless contends that Miles lacks standing to challenge VA's actions in connection with the procurement because Miles "cannot show . . . that it was a qualified bidder" and thus "cannot show that it had a substantial chance of securing the award." *See* Def.'s Mot. at 12-13. Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires that bid protests be brought by "interested parties." The "interested party" standard is more stringent than the "case or controversy" requirement of Article III of the Constitution. *See Systems Application & Techs., Inc.*, 691 F.3d at 1382 (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To meet the "interested party" standard, Miles must establish that it "(1) is an actual or prospective bidder; and (2) possess[es] the requisite direct economic interest." *Id.* (alteration in original). The posture of a protest determines the evidentiary showing necessary to establish a "direct economic interest:"

> Generally, to prove the existence of a direct economic interest, a party must show that it had a "substantial chance" of winning the contract. An exception to that standard is when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid. In that circumstance, the protestor can establish standing by demonstrating that it suffered a "non-trivial competitive injury which can be redressed by judicial relief."

*Orion Tech., Inc. v. United States*, __ F.3d __, __, 2013 WL 141740, at *13 (Fed. Cir. Jan. 14, 2013) (internal citations omitted); *see also Weeks Marine*, 575 F.3d at 1361-62 ("We have not

had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder/offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a 'but for' prejudice analysis. . . . We therefore consider whether [plaintiff] has demonstrated a 'non-trivial competitive injury which can be addressed by judicial relief.'" (internal citations omitted)).

In this instance, Miles is an actual bidder, because it submitted a bid in response to the Solicitation. AR 12-246 to -47 (Abstract of Offers). Consequently, respecting "direct economic interest," Miles must show that it has a substantial chance of winning the pertinent contract. As the government would have it, Miles cannot demonstrate that it had a substantial chance of winning the contract because it was de-listed and is now prohibited from receiving any SDVOSB contracts. Def.'s Mot. at 13. Such logic is circular and would preclude any qualified concern from ever seeking a judicial remedy in response to an adverse decision by OSDBU. To the contrary, Miles has demonstrated that it was the apparent lowest bidder and would likely have received the award but for OSDBU's decision. *See* AR 12-246 to -47 (Abstract of Offers); AR 13-248 (E-mail from Carol Pomraning to Slizofski (June 22, 2012)); AR 21-271. Accordingly, Miles has standing to challenge VA's actions in connection with the procurement.[8]

## STANDARDS FOR DECISION

Pursuant to 28 U.S.C. § 1491(b)(4), the court reviews a challenge to an agency's actions in connection with a procurement using the standards set out in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this [S]ubsection, the courts shall review the agency's decision pursuant to the standards set forth in [S]ection 706 of title 5."). These standards permit the court to set aside an agency's contracting decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), assuming the criteria for equitable relief are satisfied, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004).

Under the APA, this court's review is limited to an evaluation of whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971),

---

[8]The government cites to *CS-360, LLC v. United States*, 94 Fed. Cl. 488, 500 (2010) to support its position. *CS-360* is distinguishable. It concerned a company which, after being removed from the VIP database by OSDBU, bid on a second solicitation and then challenged the agency's actions in connection with the second solicitation. *Id*. at 493-94.

The challengers in that case subsequently brought an action in district court against the VA under the federal question statute, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 706, and obtained partial relief, consisting of a grant of summary judgment that VA had "fail[ed] to provide a satisfactory contemporaneous explanation for its decision to deny CS[-]360's application for inclusion in the VetBiz VIP database." *CS-360, LLC v. United States Dep't of Veteran Affairs*, 846 F. Supp. 2d 171, 196 (D.D.C. 2012).

6

*abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). In conducting a review under these standards, the court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure," *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Superior Helicopter, LLC v. United States*, 78 Fed. Cl. 181, 187 (2007).

If a protester makes these showings, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). To determine if a permanent injunction should issue, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC*, 389 F.3d at 1228-29).

## ANALYSIS

### A. *Statutory and Regulatory Framework*

The statutory predicate for the Veterans First Contracting Program is the Veterans Benefits, Health Care, and Information Technology Act of 2006 ("Veterans Benefits Act"), Pub. L. No. 109-461, tit. V, 120 Stat. 3403, 3425 (codified at 38 U.S.C. § 8127-28). This Act provides in pertinent part that "[i]n procuring goods and services pursuant to a contracting preference under this title or any other provision of law," VA "shall give priority to a small business concern owned and controlled by veterans," provided that the business is included in a small business database maintained by VA. 38 U.S.C. § 8128. To implement this Act, VA established the Veterans First Contracting Program in 2007, directing VA to consider SDVOSB and VOSB entities as first and second priority.

For some time, VOSB and SDVOSB entities certified themselves and self-registered in the VIP vendor database. Statutory amendments now set out at 38 U.S.C. § 8127(e) and (f) clarified the responsibilities of the Secretary of the Department of Veterans Affairs in addressing and verifying applications for inclusion in the database. *See also* VA Acquisition Regulation: Supporting Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses, 74 Fed. Reg. 64,619-01 (Dec. 8, 2009) (codified at 48 C.F.R. Parts 802, 804, 808, 809, 810, 813, 815, 817, 819, and 852) (effective Jan. 7, 2010); 75 Fed. Reg. 6098-01 (Feb. 8, 2010) (codified at 38 C.F.R. Part 74) (effective Feb. 8, 2010). The effect of those clarifications was the institution of mandatory verification by CVE, even for businesses that may have previously self-certified. Although VIP eligibility certification through CVE is governed by 38 C.F.R. Part 74, CVE's approval may be challenged through an agency-level bid protest with OSDBU, as provided in 48 C.F.R. § 819.307.

The standards for initial certification and eligibility reevaluation are congruent respecting ownership and control because, as noted *supra*, Part 819 incorporates by reference Part 74 for guidance on "ownership and control issues." Part 74 addresses ownership and control in great detail, couching the eligibility criteria in terms of what CVE considers to be qualifying. *See* 38 C.F.R. §§ 74.3 (ownership), 74.4 (control). In answer to the question "Who does [CVE] consider to own a veteran-owned small business?" Section 74.3 dictates that 51 percent of a concern must be "unconditionally and directly owned by one or more veterans or service-disabled veterans." 38 C.F.R. § 74.3. The regulation provides that

> [o]wnership must not be "subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

38 C.F.R.§ 74.3(b).

Part 74 also provides procedures for CVE to consider cancellation of VOSB status. Cancellation proceedings may be triggered by CVE "[w]hen CVE believes that a participant's verified status should be cancelled prior to the expiration of its eligibility term." 38 C.F.R. § 74.22(a). CVE is required to give notice to the firm in question, which is provided a thirty-day period in which to respond. § 74.22(b). CVE is obliged then to issue a decision setting forth the specific facts and reasons for its result. § 74.22(c). An appeal process is provided. § 74.22(e).

The agency bid-protest procedures in the VAAR are more cryptic but comparable. Protests relating to VOSBs or SDVOSBs "must be in writing and must state all specific grounds for the protest." 48 C.F.R. § 819.307(c)(1). They must be filed on or before the fifth business day after bid opening in sealed-bid acquisitions or notification by the contracting officer of the apparently successful offeror in negotiated acquisitions. § 819.307(c)(2). The regulation does not in terms specifically provide an opportunity for the successful offeror to respond to the protest, but as this case demonstrates, basic due process considerations apply to enable the successful offeror to be heard. Paragraph (c)(3) of 48 C.F.R. § 819.307 is ambiguous in describing the consequences that arise when OSDBU sustains a protest:

> (3) If the Executive Director sustains a service-disabled veteran-owned or veteran-owned small business status protest and the contract has already been awarded, then the contracting officer cannot count the award as an award to a VOSB or SDVOSB and the concern cannot submit another offer as a VOSB or SDVOSB on a future VOSB or SDVOSB procurement under this part, as applicable, *unless it demonstrates to VA that it has overcome the reasons for the determination of ineligibility*.

8

§ 819.307(c)(3) (emphasis added). It is not apparent what opportunity a previously successful offeror subject to a sustained protest would have to "overcome the reasons for the determination of ineligibility," *id*., either during the protest as such, or thereafter.

### B. OSDBU's Action

Miles posits four separate grounds in support of its claim that OSDBU's decision to remove it from the VIP database was arbitrary and contrary to law.

#### 1. *The Verification Assistance Brief.*

Miles argues that OSDBU improperly relied upon a Verification Assistance Brief ("VAB") posted on a VA website to determine that the company was ineligible for SDVOSB status. Pl.'s Mem. at 19. The pertinent VAB is one of six shown on the website and is entitled "Transfer Restrictions."[9] Miles claims that VA's issuance of the VAB was an impermissible act of rulemaking that did not follow proper procedure as set forth in 5 U.S.C. § 553. Pl.'s Mem. at 18. Miles argues that because the issuance of the VAB itself was procedurally improper, OSDBU's alleged reliance on the VAB in finding that Miles was not unconditionally owned by a service-disabled veteran was arbitrary and capricious. *Id.* at 19. Furthermore, it contends that because Miles had been verified as an SDVOSB by CVE, the later application of the VAB to nullify Miles' eligibility status was also arbitrary and capricious. *Id*. at 19-20. The government counters that VABs are "not new rules or regulations;" rather, they "are intended to be educational material for use by veterans, in order to assist veterans in determining whether their business model fits the requirements of 38 C.F.R. Part 74." Def.'s Mot. at 29.

The particular VAB at issue sets out Sections 74.3 and 74.4 of the regulations and then lists six bullet points, the third of which states that "requiring approval of other shareholders/members or a right of first refusal to purchase the Veteran's shares/interest for the Veteran owner to transfer his shares/interest" "will prevent an applicant from receiving verified status (due to ownership not meeting the 'unconditional' requirement)." *Transfer Restrictions*, Department of Veterans Affairs, available at http://www.va.gov/osdbu/docs/vapVabTransfer Restrictions.pdf (last accessed February 6, 2013). Miles represents, and the government does not controvert, that the VAB was issued on or about November 23, 2011, five days after Miles submitted its second application for verification as a SDVOSB. Pl.'s Mem. at 6.

The government's contention that the VAB "was not relied upon by the agency," Hr'g Tr. 32:18-20 (Dec. 4, 2012), is correct insofar as OSDBU's explanation for its decision makes no reference to the VAB. *See* AR 19-264 to -68 (OSDBU Decision). Nonetheless, OSDBU's

---

[9]The website is http://www.va.gov/osdbu/veteran/vapVab.asp (last accessed Feb. 6, 2013). The other five VABs shown are entitled "Board Governance," "Trusts," "Joint Ventures," "Full Time Control," and "Community Property." The website states that VABs have been provided "to assist applicants in obtaining Verification for the Veterans First [P]rogram." *Id*. More specifically, "[t]he VAB were developed in order to clarify the rules associated with 38 C.F.R. [Part] 74." *Id*.

decision tracks the pertinent bullet point set out in the VAB. In effect, the government asks the court to ignore the VAB because it does not establish any rule, policy, or guidance to be applied in OSDBU's decisionmaking process. This posture seems counterintuitive in the circumstances, but the court will honor the government's representation and put aside Miles' arguments concerning the issuance and application of the VAB.

## 2. *Unconditional Ownership.*

OSDBU's letter notifying Miles of its removal from the VIP database cited Articles X, XI, and XII of the company's Operating Agreement as containing restrictions on the transfer of Mr. Slizofski's ownership interest in violation of the "unconditional ownership" requirement of 38 C.F.R. § 74.3(b). AR 19-266. Two of those articles are beside the point. Article X simply states that owners cannot transfer their ownership interests in contravention of the Operating Agreement. AR 71-737. Article XII addresses transfers of ownership in the event of incapacity or death. AR 71-740 to -41. VA's regulation itself contains provisions specifically allowing transfer upon the death or incapacity of a veteran owner without contravening the unconditional-ownership requirement. *See* 38 C.F.R. § 74.3(e)(3) and (4). These portions of Miles' Operating Agreement provide no basis for OSDBU's decision.

Article XI, then, is the provision with which the court must concern itself. In essence, Article XI is a right-of-first-refusal clause, which affords the company, or the remaining members of the company if the company declines, the first opportunity to purchase a member's shares, should he or she decide to sell. AR 71-737 to -40 (Article XI). The article states: "A [m]ember shall not transfer a [m]embership [i]nterest unless the [m]ember shall have first offered to sell such [m]embership [i]nterest to the [c]ompany and the other [m]embers in accordance with the following provisions . . . ." AR 71-737(¶ 11.01). Thus, for the provision to be operational, a bona fide offer to purchase or a stated intent by the member to make a gift must first exist.

The government argues that the right of first refusal violates 38 C.F.R. § 74.3(b) because the provision is an executory agreement. *See* Def.'s Mot. at 27. The government relies upon a dictionary definition of "executory:" "that which is yet to be fully executed or performed; that which remains to be carried into operation or effect; incomplete; depending upon a future performance or event." Def.'s Mot. at 27 (quoting *Black's Law Dictionary* 570 (6th Ed. 1990)). According to the government, a right of first refusal "is an executory agreement because it prevents an owner from acting upon his ownership interest in instances such as a sale [that depends] upon future approval by the other members of the company." Def.'s Mot. at 27-28. The government cites to two decisions of the Small Business Administration ("SBA") in support of its interpretation. *See* Def.'s Mot. at 27 (citing *In the Matter of: Veterans Constr. Servs., Inc.*, SBA No. VET-167, 2009 WL 5646466 (Nov. 9, 2009); *In the Matter of: Int'l Logistics Grp., LLC*, SBA No. VET-162; 2009 WL 5942359 (Oct. 1, 2009)). The first case, *Veterans Construction*, determined that a service-disabled veteran did not unconditionally own a company within the meaning of 13 C.F.R. § 125.9, which governs eligibility requirements for the SBA's Service-Disabled-Veteran-Owned Small Business Concern program, because the operating

10

agreement contained tag-along rights.[10]  The second case, *International Logistics*, concludes that a right of first refusal violated the unconditional ownership provision of 13 C.F.R. § 125.9.  The findings in both instances relied on *In the Matter of: The Wexford Group Int'l, Inc.*, SBA No. SDV-105, 2006 WL 4726737 (June 29, 2006), which reasoned:

> In the context of 13 C.F.R. § 125.9, unconditional necessarily means there are no conditions or limitations upon an individual's present or immediate right to exercise full control and ownership of the concern. Nor can there be any impediment to the exercise of the full range of ownership rights. Thus, a service-disabled veteran: (1) Must immediately and fully own the company (or stock) without having to wait for future events; (2) Must be able to convey or transfer interest in his ownership interest or stock whenever and to whomever they choose; and (3) Upon departure, resignation, retirement, or death, still own their stock and do with it as they choose. In sum, service-disabled veterans must immediately have an absolute right to do anything they want with their ownership interest or stock, whenever they want.

2006 WL 4726737, at *6.

In this instance, a different regulation, 38 C.F.R. § 74.3, is at issue.  Unlike 13 C.F.R. § 125.9, Section 74.3 contains an extended definition of unconditional ownership.  *See* 38 C.F.R. § 74.3(b) (generally providing that "[o]wnership must not be subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another").  From this general starting point, the regulation notes that provisions causing ownership benefits to go to another "after death or incapacity" do not affect the unconditional nature of ownership.  *Id.*  In the same vein, *"[t]he pledge or encumbrance of stock or other ownership interest as collateral*, including seller-financed transactions, *does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms."*  *Id.* (emphasis added).  In sum, Section 74.3(b) modifies "unconditional" ownership to mean something other than the categorical bounds of the dictionary definition of the word "unconditional."

Apparently no reported decisions address the scope of executory agreements in the specific context of Section 74.3(b).  Most familiarly, the issue has arisen in the bankruptcy context.  There, courts have adopted a pragmatic definition of what qualifies as an executory contract, noting that "the inquiry is whether both parties to the contract have unperformed

---

[10]Tag-along rights "allow the other owners to participate in the selling owner's transfer to third parties on the same terms and conditions.  For example, owners B, C and D may have a right of first refusal to participate in A's attempted sale of a 12.5 [percent] interest on a pro-rata basis determined by the respective ownership percentages of all four owners. If B, C and D all decided to participate, each of the owners (including A) would sell a 4-1/4 [percent] interest to the purchaser on the same terms and conditions. Obviously, this severely dilutes A's efforts to obtain liquidity and co-sale rights are considered to be a substantial transfer impediment." 4 *Business Transactions Solutions* § 25:12 (internal citations omitted).

obligations that would constitute a material breach if not performed.  If so, the contract is executory."  *In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007); *see also In re Capital Acquisitions & Mgmt. Corp.*, 341 B.R. 632 (Bankr. N.D. Ill. 2006); *In re The IT Group, Inc., Co.*, 302 B.R. 483 (Bankr. D. Del. 2003) (determining that normal commercial rights of first refusal were not executory contracts under the Bankruptcy Code).  "While almost all agreements to some degree involve unperformed obligation[s] on either side, such an expansive definition of the term 'executory' is not what Congress enacted through its choice of language in [the Bankruptcy Code]." *Gouveia v. Tazbir*, 37 F.3d 295, 298-99 (7th Cir. 1994).  This reasoning seems relevant to the court's interpretation of C.F.R. § 74.3(b).  A right of first refusal does not necessarily burden either party with unperformed obligations that would constitute a material breach if not performed.

Furthermore, the language of C.F.R. § 74.3(b) illustrates that by prohibiting executory agreements, the drafters were attempting to prevent "ownership benefits," such as voting rights or the distribution of profits or losses, from falling into the hands of non-veterans, even as the company appeared to operate under the auspices of the veteran majority owner.  Like the encumbrance of veteran-owned stock as collateral, inclusion of a standard right of first refusal in an operating agreement is a "normal commercial practice[]," 38 C.F.R. § 74.3(b), that does not hinder the veteran-owner's interest unless the veteran receives a bona fide offer and chooses to sell.  Moreover, upon a sale, the company would not automatically retain its eligibility for the VIP database, because it may no longer be owned by a veteran who could qualify for the database.  *See* 38 C.F.R. § 74.3(e)(4) (requiring CVE to verify that all eligibility requirements continue to be met by the concern and the new owners).  In sum, the right of first refusal provision in Article XI is not presently executory, is a standard provision used in normal commercial dealings, and does not burden the veteran's ownership interest unless he or she chooses to sell some of his or her stake.  As a result, Article XI, Paragraph 11.01 does not affect the veteran's unconditional ownership with regard to C.F.R. § 74.3(b).  The decision by OSDBU to the contrary, *i.e.*, that Articles X, XI, and XII of the operating agreement rendered Miles ineligible for the VIP database, was arbitrary and capricious and contrary to law.

### 3.  *OSDBU's Consideration of Grounds Not Raised by the Contracting Officer or Agency Protester.*

Miles additionally argues that OSDBU violated 48 C.F.R. § 819.307 by reviewing the veteran's unconditional ownership, a ground it contends was not raised by the Protest. Pl.'s Mem. at 20.  The regulation governing the protest process states that "the Executive Director. . . [of OSDBU] shall decide all protests on service-disabled veteran-owned or veteran-owned small business status whether raised by the contracting officer or an offeror.  Ownership and control shall be determined in accordance with 38 C[.]F[.]R[.] part 74."  48 C.F.R. § 819.307(c).  The regulation further states that "[a]ll protests must be in writing and must state all specific grounds for the protest.  Assertions that a protested concern is not a service-disabled veteran-owned or veteran-owned small business concern, without setting forth specific facts or allegations, are insufficient."  48 C.F.R. § 819.307(c)(1).

Miles argues that this language confines OSDBU to issues specifically raised by a protesting offeror or the contracting officer.  Pl.'s Mem. at 20-21.  Miles relies upon 38 C.F.R.

§§ 74.21 and 74.22 to support its interpretation of Section 819.307, because these regulations empower CVE, not OSDBU, to initiate an investigation if VA believes a participant's verified status should be canceled prior to the expiration of its eligibility term. *See* Pl.'s Mem. at 23-26. Section 74.21 provides that CVE "may cancel the 'verified' status button for good cause . . . including [f]ailure by the participant to maintain its eligibility for program participation [or] [f]ailure by the participant for any reason . . . to maintain ownership, management, and control by veterans, service-disabled veterans[,] or surviving spouses." 38 C.F.R. § 74.21(c). Section 74.22 requires that the veteran participant be given notice of CVE's proposed grounds for removal and a thirty-day period within which it can respond. When read in concert, Miles argues, these regulations give CVE the responsibility for investigating whether a verified company has maintained its status, while OSDBU should only address verification allegations specifically raised in protests. *See* Pl.'s Reply at 14, ECF No. 34.

In its protest letter, Veteran focused on the allegation that Miles Construction was a "pass thru" for another construction company, AR 14-249, whose owner is a minority owner of Miles, *see* AR 105-1033. Veteran asserted that the two companies were affiliated by their common ownership, meaning that Miles did not meet the standard requiring "at least 51 percent of each class member interest [to] be unconditionally owned by one or more veterans or service[-]disabled veterans." AR 14-250 (quoting 38 C.F.R. § 74.3). Veteran neither mentioned nor addressed restrictions on Mr. Slizofski's ownership interest beyond these contentions that Mr. Slizofski's ownership interest is a façade and that another company actually controls Miles.[11]

Here, OSDBU interpreted 48 C.F.R. § 819.307(c) in a manner that allowed it to expand the protest to encompass Miles' general compliance with the verification requirements. The government argues that OSDBU's interpretation is reasonable because it provides a streamlined, separate path for OSDBU to make a "time sensitive," "final" decision about whether a company is eligible for a procurement set aside for entities in the VIP database in response to a bid protest. H'rg Tr. 37:1-38:6. This argument has some basis. Certainly agencies have a responsibility to reach decisions on protests promptly. Moreover, the court gives deference to OSDBU's position that it can reach beyond a protester's allegations or a contracting officer's refusal to raise additional issues.[12] That circumstance, however, does not excuse a failure to provide basic due process to affected offerors. An agency should not act without affording an entity whose award or projected award is protested with notice of an alleged defect and an opportunity to respond. An interpretation of 48 C.F.R. § 819.307(c) that does not allow this basic procedural due process is plainly erroneous and cannot be upheld.

---

[11]The parties do not dispute that the contracting officer did not raise any further issues when forwarding the protest to OSDBU. *See* AR 102-1021 to -24 (documentation of the transfer of the protest from the contracting officer to OSDBU).

[12]An agency's interpretation of its regulations is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989) (in turn quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945))).

4. *OSDBU's Cancellation of Miles' Status as a SDVOSB.*

Miles argues that the termination of its status as an SDVOSB was arbitrary and capricious because OSDBU did not follow the cancellation procedures set forth in 38 C.F.R. § 74.22, which include a right of response, a waiting period, and a right of appeal. Pl.'s Mem. at 24-25, 27. In response, the government contends that the agency-protest process set forth in 48 C.F.R. § 819.307 does not incorporate those procedural requirements and that OSDBU's action was sufficient under the agency-protest system. Def.'s Mot. at 30, 32-33.

48 C.F.R. § 819.307 assigns responsibility to the Executive Director of OSDBU to "decide all protests on service-disabled veteran-owned or veteran-owned small business status whether raised by the contracting officer or an offeror." 48 C.F.R. § 819.307(c). The regulation specifies that ownership and control issues "shall be determined in accordance with 38 C[.]F[.]R[.] part 74." *Id.* The regulation then sets forth several procedural requirements related to the protest and investigatory process, namely that all protests must be in writing and must state "all specific grounds for the protest," and that protests must be submitted to the contracting officer, who must receive them by close of business on the fifth business day after bid opening or after notification by the contracting officer of the apparently successful offeror. *Id.*

As a matter of administrative law, OSDBU's determination falls within the category of informal agency adjudication.[13] Section 555 of the APA establishes rudimentary "procedural requirements for informal adjudication." *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 767 (2006) (citing *Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 484 (2006) (in turn citing *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990) and quoting Ronald J. Krotoszynski, *Taming the Tail That Wags the Dog: Ex Post and Ex Ante Constraints on Informal Adjudication*, 56 Admin. L. Rev. 1057, 1059 (2004))). Section 555(b) of the APA provides that a party is entitled to be heard in an agency proceeding, absent exigent circumstances:

> A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding. So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function.

5 U.S.C. § 555(b); *see also Advanced Sys. Tech., Inc.*, 69 Fed. Cl. at 484 ("Further, [S]ection 555(b) is 'universally understood to establish the right of an interested person to participate in an

---

[13]*See* 5 U.S.C. §§ 551(5) ("'rule making' means agency process for formulating, amending, or repealing a rule"), 551(7) ("'adjudication' means agency process for the formulation of an order"). Formal, as contrasted to informal, adjudication procedures are addressed by 5 U.S.C. § 554(a), which "applies . . . in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a).

on-going agency proceeding.'" (quoting *Block v. Securities and Exch. Comm'n*, 50 F.3d 1078, 1085 (D.C. Cir. 1995))). The Supreme Court in *Pension Benefit* indicated that a party's entitlement to the protections afforded by Section 555 corresponds to procedural due process. *See* 496 U.S. at 655-56. In that respect, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Although 48 C.F.R. § 819.307 did not explicitly call for it, OSDBU notified Miles of the protest and provided it an opportunity to respond to the specific allegations in the protest letter. *See* AR 104-1027 to -28 (E-mail exchange between Endicott and Slizofski). OSDBU did not, however, notify Miles about its self-initiated "unconditional ownership" examination. Accordingly, Miles had no opportunity to address OSDBU's position that Mr. Slizofski's ownership was restricted in a disqualifying way. No exigent circumstances curtailed Miles' opportunity to be heard in this regard.[14] In short, OSDBU's examination contravened "the minimal requirements" for informal adjudication set forth in Section 555 of the APA. *Pension Benefit*, 496 U.S. at 655; *see also* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1297-98 (1975) (postulating that more severe governmental actions require greater procedural safeguards). Therefore, OSDBU's decision is invalid under Section 706(2)(A) of the APA. *See Impresa Construzioni*, 238 F.3d at 1332.[15]

### C. Prejudice

OSDBU's interpretation of unconditional ownership, along with its violative interpretations of the procedural requirements of 48 C.F.R. § 819.307, amounted to arbitrary and capricious conduct. This finding does not end the inquiry, however. "To prevail in a bid protest, a disappointed offeror must show both significant error in the procurement process and prejudice to its posture in the process." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 203 (2004) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed. Cir. 2000)), *aff'd*, 389 F.3d 1219. To establish prejudice, "a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

---

[14]The government contends that 48 C.F.R. § 819.307 sets forth a "more streamlined process of review necessitated by the time-sensitive nature of procurement cases" than the normal cancellation process dictated by 38 C.F.R. § 74.22 and used outside of the bid protest setting. *See* Def.'s Mot. at 30. Particular bid protests can indeed be time sensitive. Nonetheless, as a generic matter, VA's agency protests are not so constrained by time that notice and an opportunity to be heard can be cast aside.

The government's "streamlined process" argument in this particular case is severely undercut by the fact that VA's contracting officer waited six weeks to forward Veteran's protest to OSDBU for action. *See supra*, at 3.

[15]After OSDBU decided to cancel Miles' SDVOSB status, Miles attempted to satisfy OSDBU's characterization of the unconditional-ownership requirement and regain its status by submitting a revised operating agreement that did not contain the provisions relating to a right of first refusal. *See* Pl.'s Mem. at 22-23. Miles' effort was ignored by OSDBU.

The prejudice inquiry in this determination on the merits is distinct from the jurisdictional determination of the existence of prejudice to provide standing as an "interested party." *See Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368, 377 (2012) (citing *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353–54 (Fed. Cir. 2011)). However, "if none of the challenged agency decisions survives judicial review — *i.e.*, if all decisions alleged to be unlawful are adjudged to be so — a second prejudice inquiry would simply duplicate the first and would thus be redundant." *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010). In this instance, challenges to OSDBU's decision have been upheld. Thus, the prejudice inquiry is truncated. But for OSDBU's arbitrary and capricious interpretations of the meaning of "unconditional ownership" in 38 C.F.R. § 74.3 and its use of improper procedures to implement 48 C.F.R. § 819.307, Miles would have remained an eligible SDVOSB and, as the lowest bidder, it would have had a substantial chance of receiving the award under the Solicitation. In short, Miles has shown that it was prejudiced by OSDBU's errors.

## D. *Relief*

The court may award declaratory or injunctive relief that is proper in the circumstances. *See* 28 U.S.C. § 1491(b)(2). To determine if a permanent injunction should issue, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037.

### 1. *Success on the merits.*

As established *supra*, Miles has succeeded on the merits of its complaint.

### 2. *Irreparable harm.*

Miles contends that it will suffer irreparable harm because of lost profits. Pl.'s Mem. at 29. More drastically, Miles notes that the removal of its eligibility to compete for SDVOSB procurements, which constitute a substantial amount of its work, threatens Miles' ability to continue as a viable business. *Id.* ("It is an unfortunate reality of the construction business that the inability to bid on [p]rojects for only several months can have a devastating, or even terminal, effect on a contractor's business."). Removal from the SDVOSB list prevents Miles from bidding on any future SDVOSB set-aside contracts. The injunctive relief contemplated here (setting aside OSDBU's removal of Miles from the VIP database) would circumvent this type of harm because Miles would once again be eligible to compete for and to receive SDVOSB set-aside contracts. The government argues that economic loss, without more, cannot constitute irreparable harm. Def.'s Mot. at 35. Its argument is misplaced. The real harm suffered by Miles is the denial of the opportunity to compete for the Solicitation award and for future SDVOSB set-aside contracts. Denial of the opportunity to compete for a contract can constitute irreparable harm. *See, e.g., Electronic On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 169 (2012); *NetStar–1 Gov't Consulting v. United States*, 101 Fed. Cl. 511, 530 (2011). In short, Miles will suffer irreparable harm if injunctive relief does not issue.

16

3. *Balance of hardships.*

The government argues that VA will be harmed because "VA cannot act contrary to established authority and award the solicitation to an offeror who is not in the database and [thus is] ineligible for the award." Def.'s Mot. at 36. The government proffers circular logic. If Miles is restored to the VIP database by the court, VA would be obliged fully and fairly to consider Miles' apparent low bid in response to the Solicitation, as well as any other bids it submits in response to other solicitations while in the database. Given the severity of the irreparable harm Miles will suffer in the absence of relief and the government's failure to demonstrate harm, the court finds that the balance of hardships weighs in favor of granting a permanent injunction.

4. *Public interest.*

The public has a strong interest in preserving the integrity of the procurement process. *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242-43 (2010); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004). By ensuring that plaintiff has an opportunity to compete fairly in SDVOSB set-aside procurements, this public interest will be served.

**CONCLUSION**

For the reasons stated, the plaintiff's motion for judgment on the administrative record is GRANTED IN PART, and the government's motion to dismiss or, in the alternative, cross-motion for judgment on the administrative record is DENIED. OSDBU's decision dated August 27, 2012, rendering Miles ineligible for awards of contracts as a SDVOSB, is set aside. VA shall restore Miles to its roster of approved SDVOSB entities and consider Miles' apparent low bid in response to the Solicitation.[16] Miles' verified eligibility to participate in VA's Veterans First Contracting Program shall be extended by 164 days, to August 16, 2013, to take account of the days it was wrongfully removed from eligibility.[17] The clerk shall enter judgment in accord with this disposition.

---

[16]The court declines to issue an injunction directing an award of a contract to Miles under the Solicitation.

[17]The court additionally has pending before it a motion by Miles to supplement the administrative record with documents and records used by VA's Office of General Counsel in preparing OSDBU's decision for the Executive Director's signature. *See* Pl.'s Mot. to Supplement the Admin. Record at 3-4, ECF No. 25. The government resists this motion on the ground that these materials have been omitted from the administrative record on the basis of attorney-client privilege and the protection provided by the work product doctrine. *See* Def.'s Resp. to Pl.'s Mot. to Supplement the Admin. Record at 3-4, ECF No. 28.

Also pending is Plaintiff's Second Mot. to Supplement the Admin. Record, ECF No. 27, seeking to add documents related to the issuance and distribution of the VAB posted on VA's website and Miles's effort to revise its operating agreement after OSDBU had issued its decision. The government resists this motion on the ground that the documents are "irrelevant" and "had nothing to do with the agency's decisionmaking in this case." Def.'s Resp. to Pl.'s Second Mot. to Supplement the Admin. Record at 1, ECF No. 32.

17

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

The court addressed a portion of Miles's first motion when it granted an unopposed motion by the government to amend and correct the administrative record by including certain documents that, among other things, provide a "timeline" for OSDBU's action. *See* Order of Oct. 18, 2012, ECF No. 24. In other respects, Miles's motions are DENIED. The VABs issued by VA are public documents and thus are available to the court, and the government has consistently averred that the VAB entitled "Transfer Restrictions" had no bearing on OSDBU's decision.